UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

Nos.  19-1582, 19-1625

UNITED STATES
Appellant,

v.

NIA MOORE-BUSH
Defendant-Appellee
_____

_____

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS SUPPRESSING
EVIDENCE IN A CRIMINAL CASE

_____

**BRIEF OF
<u>DEFENDANT-APPELLEE NIA MOORE-BUSH</u>**

Judith H. Mizner
Assistant Federal Public Defender
Federal Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 11056

# TABLE OF CONTENTS

Page

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Issue Presented for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.      THE DISTRICT COURT CORRECTLY FOUND THE
        WARRANTLESS USE OF A POLE CAMERA
        WITH REMOTELY ACCESSIBLE ZOOM, PAN AND TILT
        FEATURES TO CONDUCT CONTINUOUS SURVEILLANCE
        OVER AN EIGHT MONTH PERIOD, DIRECTED AT THE FRONT
        EXTERIOR, DRIVEWAY, AND ATTACHED GARAGE OF A
        PRIVATE RESIDENCE, WHICH SURVEILLANCE COULD BE
        REVIEWED AND SEARCHED AT ANY TIME, WAS
        A SEARCH THAT VIOLATED THE FOURTH AMENDMENT . . . . . . .10

A.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.      The Decision Below Does Not Contravene the Law of the
        Circuit Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

        1.      The *Bucci* Decision and the Claim in This Case . . . . . . . . . . . . . . . 11

        2.      The Law of the Circuit Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . .12

C.      The District Court Correctly Concluded That the Warrantless
        Eight Month Continuous Pole Camera Surveillance in This
        Case Was an Unconstitutional Search . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1.    Ms. Moore-Bush Had a Subjective Expectation of Privacy
in the Whole of Her Movements and Those of Her Family and
Visitors at the Front of Her Home and in Her Driveway
Over an Eight Month Period of Time. . . . . . . . . . . . . . . . . . . . . . . . 18

2.    Ms. Moore Bush's Subjective Expectation of Privacy
In the Whole of Her Movements and Those of Her Family
And Visitors at the Front of her Home and in her Driveway
Over an Eight Month Period of Time Was Objectively
Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

D.    The Good Faith Exception Does Not Apply. . . . . . . . . . . . . . . . . . . . . .25

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Addendum

# TABLE OF AUTHORITIES

Page

Cases

*Bond v. United States*,
    529 U.S. 334 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*California v. Ciraolo*,
    476 U.S. 207 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*Carpenter v. United States*,
    __U.S.__, 138 S.Ct. 2206 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co.*,
    215 F.3d 136 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Crowe v. Bolduc*,
    365 F.3d 86 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Davis v. United States*,
    564 U.S. 229 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 28

*Johnson v. United States*,
    559 U.S. 133 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Riley v. California*,
    573 U.S. 374 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*United States v. Andujar-Arias*,
    507 F.3d 734 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Brown*,
    621 F.3d 48 (1st Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Bucci*,
    582 F.3d 108 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*United States v. Holloway*,
    630 F.3d 252 (1st Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13, 14

*United States v. Jones,*
    565 U.S. 400 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*United States v. Knotts*,
    460 U.S. 276 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Mangos,*
    134 F.3d 469 (1st Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 14

*United States v. McNicol,*
    829 F.3d 77 (1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Moore-Bush,*
    381 F.Supp.3d 139 (D.Mass. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . .passim

*United States v. Ramirez-Rivera,*
    800 F.3d 1 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Rheault*,
    561 F.3d 55 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Rivera,*
    825 F.3d 59 (1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*United States v. Rodriguez,*
    527 F.3d 221 (1st Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 12, 13, 14

*United States v. Tanco-Pizarro,*
    892 F.3d 472 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Wurie,*
    728 F.3d 1 (1st Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 27

## CONSTITUTIONAL PROVISIONS

United States Constitution
    First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 23
    Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 23

## JURISDICTIONAL STATEMENT

Ms. Moore-Bush accepts the government's statement of jurisdiction.

## ISSUE PRESENTED FOR REVIEW

Whether the district court correctly suppressed evidence obtained from a pole camera placed across the street from Ms. Moore-Bush's residence to surveil part of the front of the house, the driveway, and the attached garage, where the camera was installed and operated without a warrant, could be remotely operated to zoom, pan, and tilt, and was used to continuously record information for eight months, which information could be reviewed and searched at any time?

## STATEMENT OF THE CASE

Following an investigation beginning in January, 2017, Nia Moore-Bush, her husband Dinelson Dinzey, and three others were charged in an indictment returned on January 11, 2018 with conspiracy to distribute and to possess with intent to distribute heroin and cocaine base. More than 11 months later a superseding indictment added, *inter alia*, substantive drug charges, conspiracy and

substantive money laundering charges, and charges alleging firearms offenses against Ms. Moore-Bush.[1]  G.App. 9, 20, 37-62.[2]

On or about May 17, 2017, the government, proceeding without a warrant, installed a pole camera on a utility pole across the street from the home of Daphne Moore at 120 Hadley Street, Springfield, MA.  Add.3; G.App.77.  Ms. Moore is the mother of Nia Moore-Bush.  Ms. Moore-Bush and her family had been living with Ms. Moore beginning around February, 2017.  G.App.77

An affidavit in support of a later obtained wiretap represented that 120 Hadley Street "is located on a quiet residential street where physical surveillance [is] difficult to conduct without detection."  G.App.64.  The camera surveilled the driveway, part of the front of the house, and the attached garage.  A tree partially obscured its view.  Add.3; G.App. 205.  For eight months the camera recorded and maintained a digitized video record of events occurring there. Add.3  Law enforcement officers watching the video live could operate the camera remotely to zoom, pan, and tilt.  *Id.*  Officers could use the zoom feature to read license plates

---

[1] The indictment also added defendants, including Ms. Moore-Bush's mother, Daphne Moore.

[2] "G.App." refers to the Appendix prepared by the government. "Add." will refer to the Addendum to this brief.  "G.B." will refer to the government's principal brief.  "D.E." will refer to the district court docket entries.

and see faces and other information, but could not see into the interior of the home. Add.3; G.App. 106-107.[3]

Both Ms. Moore-Bush and Ms. Moore filed motions to suppress evidence obtained from the pole camera. D.E. 358, 326; G.App. 63-83.  After argument, the district court granted those motions.  D.E.422; Add.1.  The court rejected the government's argument that the continuous, eight month long, video recording from the pole camera was not a search within the meaning of the Fourth Amendment. It held that defendants "have exhibited an actual, subjective expectation of privacy that society recognizes as objectively reasonable." Add.5; *United States v. Moore-Bush*, 381 F.Supp.3d 139, 143 (D.Mass. 2019).  The court explained:

> First, the Court infers from their choice of neighborhood that they subjectively expected that their and their houseguests' comings and goings over the course of eight months would not be surreptitiously surveilled…. Second, the Court rules that the Pole Cameras collected information that permitted the Government to peer into Moore-Bush and Moore's private lives and constitutionally protected associations in an objectively unreasonable manner.

*Id.*

---

[3] Photographs taken from the video illustrate the ability to zoom in on license plates and faces.  *See e.g.* G.App. 151, 153, 157-159, 180, 182, 184, 185, 187, 192.

3

Recognizing that this Court had approved the use of a pole camera pointed at a front door for an eight month period of time in *United States v. Bucci*, 582 F.3d 108, 116-117 (1st Cir. 2009), the district court concluded that it was no longer binding in light of subsequent Supreme Court precedent[4] undermining *Bucci*'s foundation "that the 'legal principle' that '[a]n individual does not have a reasonable expectation of privacy in items or places he exposes to the public' disposed of the matter ."  Add.6; 381 F.Supp. 3d at 144. The court explained that *Carpenter*'s "necessary reasoning: that is, a person does have some objectively reasonable expectations of privacy when in open spaces visible to the public" could not be reconciled "with Bucci's blanket statement that no such expectations exist."  Add.7; 381 F.Supp 3d at 145.  The court rejected the government's arguments that *Carpenter* was limited to cell-site location information and that the pole camera here should be equated with a security camera.  Add.7-8; 381 F.3d at 145-146.

The district court framed the question as whether, in light of the principles in *Carpenter* and *United States v. Jones*, 565 U.S. 400 (2012) Moore-Bush and Moore had an objectively reasonable expectation of privacy "in the whole of their movements over the course of eight months from continuous video recording with

---

[4] *Carpenter v. United States*, __U.S.__, 138 S.Ct. 2206 (2018).

the magnification and logging features in the front of their house" (Add. 6; 381
F.Supp.3d at 144), or "in their and their guests' activities around the front of the
house for a continuous eight-month period" (Add. 8; 381 F.Supp.3d at 146). The
district court stated that:

> [T]hree principles from the <u>Jones</u> concurrences and <u>Carpenter</u> dictate
> the resolution of this motion. First,… "[a]wareness that the
> Government may be watching chills associational and expressive
> freedoms. And the Government's unrestrained power to assemble data
> that reveal private aspects of identity is susceptible to abuse."…
> Second,… technologies that permit law enforcement officers to access
> and search vast amounts of passively collected data may "give police
> access to a category of information otherwise unknowable."… Third,
> … "relatively short-term monitoring of a person's movements on
> public streets accords with expectations of privacy that our society has
> recognized as reasonable. But the use of longer-term GPS monitoring
> in investigations of most offenses impinges on expectations of
> privacy."

Add. 9-10; 381 F.Supp.3d at 147-148.

Applying these principles, the court found all three applicable. "The
continuous video taken by the Pole Camera…threatens to chill…religious,
political, and associational activities" protected by the First Amendment. Add.10-
11; 381 F.Supp.3d at 148-149.[5] That the video was continuous, recorded, and

---

[5] The court posited a few examples. Knowing that the government was
collecting "a detailed log of when a home's occupants were inside and when
visitors arrived and who they were" could chill the religious observance of those
who met in private homes. The government "has no business knowing that
someone other than the occupant's spouse visited the home late at night when the

digitized, enabling the government to "go back on a whim and determine a home occupant's routines with to-the-second specificity" (Add. 11; 381 F.Supp.3d at 149), provided a "capability distinguish[ing] this surveillance from [imperfect] human surveillance." *Id.* Moreover, "Justice Alito's conclusion that society reasonably expects to be free from long-term surveillance in public applies with equal force to society's reasonable expectations about the public space in front of a person's home." *Id.*

The court's decision was limited. It did not hold that the use of a pole camera "necessarily constitutes a search." Rather, it was the combination of the "video recording for approximately eight months;" the "focus on the driveway and front of the house;" the "ability to zoom in so close that it can read license plate numbers;" and the "creation of a digitally searchable log," that created an objectively reasonable expectation of privacy. Add.12; 381 F.Supp.3d at 150.

## SUMMARY OF ARGUMENT

Law enforcement conducted warrantless, 24/7, eight month long surveillance of the front exterior, driveway, and attached garage of Ms. Moore-

---

spouse was away and left early in the morning." It has no "business tracking a homeowners' hobbies or regular trips for appointments." "Perhaps people would hesitate to have supporters of opposition political parties visit if they knew that the Government might be monitoring their driveway." Add. 10; 381 F.Supp.3d at 148.

Bush's home in a quiet residential neighborhood, using a hidden pole camera that could be operated remotely to zoom in on license plates, faces, and any other objects in the area. It recorded the comings and goings of Ms. Moore-Bush, her family members, and visitors and their activities at the front of the house and in the driveway. The recorded information could be reviewed and searched at any time. The district court correctly held that that surveillance was a search within the meaning of the Fourth Amendment. It was a search that violated the Fourth Amendment.

The district court's decision correctly addressed the law of the circuit doctrine, concluding that *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009) was not controlling. *Bucci* relied on the legal principle that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public." *Id.* at 117. The claim in this case is different. Ms. Moore-Bush  asserted an objectively reasonable expectation of privacy that the totality of her movements and activities and associations with family members and visitors in the front of her home and driveway over an eight month period would not be continuously recorded over an eight month period and that that information, which included enhancements of license plates and faces by officers zooming in while operating the camera

remotely, would not be available for review and further search by law enforcement.

Alternatively, the Supreme Court's decisions in *Carpenter v. United States*, 138 S.Ct. 2206 (2018) (warrantless obtaining of cell site location information (CSLI) for defendant's telephone spanning 127 days and enabling the government to catalog defendant's movements constituted an unlawful search) and *United States v. Jones*, 565 U.S. 400 (2012) (GPS tracking of an automobile for 28 days) , both decided after *Bucci*, give rise to application of an exception to the law of the circuit doctrine discussed in *United States v. Holloway*, 630 F.3d 252 (1st Cir. 2011) and *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).  They cast sufficient doubt on the holding in *Bucci* and add a new gloss to the analysis to be applied to the issue presented sufficient to warrant a fresh look. Argument I.B., pp. 11-18.

The district court reasonably inferred that from Ms. Moore-Bush's choice of a quiet residential neighborhood and a home with a large tree in front, Ms. Moore-Bush and her mother "did not subjectively expect to be surreptitiously surveilled with meticulous precision each and every time they or a visitor came or went from their home." Add.6; 381 F.Supp.3d at 144.   It found that Ms. Moore –Bush had an expectation that her, her family's, and her visitors' comings and goings and

activity in the front of the house and the driveway over an eight month period would not be information secretly recorded and stored for future use by law enforcement agents using a hidden camera which could zoom in on faces, license plates, and other objects. The district court's conclusion that Ms. Moore-Bush had a subjective expectation of privacy should be affirmed.  Argument I.C.1, pp. 18-21.

Ms. Moore-Bush's expectation of privacy is one that is objectively reasonable under the reasonable expectation of privacy analysis used by the Supreme Court in *Carpenter*, an analysis that incorporated portions of the analyses of the concurring opinions in *Jones*.  The Court has recognized that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere."  *Carpenter*, 138 S.Ct. at 2217.

Recognizing an objectively reasonable expectation of privacy against the type of surveillance here does not imply a right to privacy against the use of security cameras in public places. The latter type of surveillance does not produce anything close to the degree of intrusion generated by the former.  The continuous and extensive nature of the surveillance here also distinguishes this case from the more limited warrantless surveillance intrusions into a person's backyard or warrantless tracking of a person's movements on roadways the Supreme Court has held do not infringe on an objectively reasonable expectation of privacy.

The enhanced intrusion arising from the ability to review stored information also sets the surveillance here apart from human surveillance by law enforcement or the observations of neighbors or passersby.  Argument I.C.2, pp. 21-25.

Finally, the good faith exception does not apply.  The government waived any argument that the law enforcement actions here could be justified by good faith reliance on *Bucci* by failing to raise that argument in a timely fashion in the district court.   Even if this Court were to apply plain error review to the argument it fails.  It was the government's burden to establish that the officers in fact relied in good faith on *Bucci* for their actions.  It failed to introduce any evidence addressing the basis for the officers' actions.  Argument 1.D., pp.25-28.

## ARGUMENT

**I.  THE DISTRICT COURT CORRECTLY FOUND THE WARRANTLESS USE OF A POLE CAMERA WITH REMOTELY ACCESSIBLE ZOOM, PAN, AND TILT FEATURES TO CONDUCT CONTINUOUS SURVEILLANCE OVER AN EIGHT MONTH PERIOD, DIRECTED AT THE FRONT EXTERIOR, DRIVEWAY, AND ATTACHED GARAGE OF A PRIVATE RESIDENCE, WHICH SURVEILLANCE COULD BE REVIEWED AND SEARCHED AT ANY TIME, WAS A SEARCH THAT VIOLATED THE FOURTH AMENDMENT**

### A. Standard of Review

This Court reviews the district court's findings of fact on a motion to suppress for clear error and its legal conclusions, including constitutional

determinations, de novo.  *See United States v. Wurie*, 728 F.3d 1, 2-3 (1st Cir.

2013).  "[I]f the district court chooses to draw a reasonable (though not inevitable)

inference from a particular combination of facts, that inference is entitled to

deference."  *United States v. Brown*, 621 F.3d 48, 55 1srt Cir. 2010) (interior

quotes omitted).  When reviewing a suppression ruling this Court may "affirm on

any ground appearing in the record."  *United States v. Rivera*, 825 F.3d 59, 64 (1st

Cir. 2016).

### B.  The Decision Below Does Not Contravene the Law of the Circuit Doctrine

#### 1.  The *Bucci* Decision and the Claim in This Case

The government maintains that *Bucci* is dispositive and binding on this

Court under the law of the circuit doctrine. G.B. 15-24.  Ms. Moore-Bush

disagrees.  The *Bucci* panel upheld the district court's denial of the motion to

suppress video camera surveillance of the front of Bucci's house over an eight

month period, holding that Bucci had failed to establish an objectively reasonable

expectation of privacy "in the front of his house as viewed by the camera." 582

F.3d at 116. The panel stated that "[a]n individual does not have an expectation of

privacy in items or places he exposes to the public" and that "[t]hat legal principle

is dispositive here."  *Id.* at 117.

The claim asserted here is not simply that Ms. Moore-Bush had an

objectively reasonable expectation of privacy in the front of the house.  As described by the district court: "Moore-Bush and Moore claim that they expected privacy in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house." Add. 5-6; 381 F.Supp.3d at 143-144. Since the claim asserted here differs from that asserted in *Bucci*, *Bucci* does not address the same issue and should not be deemed controlling here.  As set forth *infra*, the district court's resolution of the issue presented in this case is correct and should be affirmed.

Alternatively, if the issue resolved by the *Bucci* panel is deemed similar enough to the issue raised here to call into play the law of the circuit doctrine, Ms. Moore-Bush maintains that the exceptions to that doctrine described below apply. Again, for the reasons set out *infra* the district court's resolution of the issue presented here is correct and should be affirmed.

## 2.  The Law of the Circuit Doctrine

Under the law of the circuit doctrine a subsequent panel is generally bound by a prior panel decision closely on point.  However, the doctrine "is 'neither a straitjacket nor an immutable rule.'" *United States v. Rodriguez*, 527 F.3d 221, 224 (1st Cir. 2008).  There are exceptions for the impact of subsequent authority.  *See e.g. United States v. Holloway*, 630 F.3d 252, 258 (1st Cir. 2011) ("The most well

known exception…applies when '[a]n existing panel decision [is] undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court.'"); *United States v. Rodriguez, supra*, 527 F.3d at 225 ("A second, less obvious exception comes into play in 'those relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind.'").

In *Holloway* this Court revisited whether Massachusetts simple assault and battery qualified as a harmful battery (and, therefore, a violent felony or crime of violence for purposes of the Armed Career Criminal Act or the career offender provision of the federal sentencing guidelines) because the state charging document used the boilerplate language "did assault and beat." The panel recognized that prior panels had found the boilerplate language sufficient to establish a violent felony or crime of violence in a number of cases beginning with *United States v. Mangos*, 134 F.3d 469 (1st Cir. 1998). The panel also recognized that the law of the circuit doctrine "dictates that '[i]n a multi-panel circuit…newly constituted panels ordinarily are constrained by prior panel decisions directly (or even closely) on point.'" 630 F.3d at 258.

Nevertheless, the panel stated that it would take a fresh look notwithstanding

the law of the circuit doctrine, because a subsequent Supreme Court decision (*Johnson v. United States*, 559 U.S. 133 (2010) (addressing Florida felony battery)), although "not directly on point," "casts sufficient doubt on the reasoning set forth in *Mangos* to require us to take a fresh look at the issue." 630 F.3d at 254. The panel further noted that "[a] Supreme Court opinion need not be directly on point to undermine one of our opinions." 630 F.3d at 258. It concluded "[a] close inspection of the Supreme Court's analysis in *Johnson*, … reveals a significant tension between the reasoning of *Johnson* and the reasoning in *Mangos*. 630 F.3d at 259. And the panel abrogated *Mangos*.

Similarly, in *United States v. Rodriguez*, *supra*, the panel reexamined the decision in *United States v. Andujar-Arias*, 507 F.3d 734 (1st Cir. 2007) (holding that sentencing disparity based on the absence of a fast-track program for immigration crimes could not support a variant sentence) based on subsequent Supreme Court cases it described as providing a "new gloss" on the analysis to be applied. 527 F.3d at 222. *See also Crowe v. Bolduc*, 365 F.3d 86, 92 (1st Cir. 2004) (reevaluating circuit case addressing prejudgment interest in civil case based on subsequent Supreme Court case which was distinguishable but contained relevant dictum); *Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co.*, 215 F.3d 136 (1st Cir. 2000) (examining whether circuit case

14

"though not directly overruled or superseded, fairly can be said to have fallen by the wayside" based on analytical shift in subsequent Supreme Court cases).

Here, *Carpenter v. United* States, 138 S.Ct. 2206 (2018) and *United States v. Jones*, 565 U.S. 400 (2012), while not addressing months long continuous pole camera surveillance, both cast sufficient doubt on the holding in *Bucci* or add a gloss to the applicable analysis that militates in favor of a new approach, as taken by the district court.

*Carpenter*, building on *Jones* and other cases, applied a broader mode of analysis than the narrow legal principle set out in *Bucci*.  An individual does not relinquish all expectation of privacy by leaving her home.

> A person does not surrender all Fourth Amendment protection by venturing into the public sphere….a majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements.

*Carpenter*, 138 S.Ct at 2217.[6]  *Carpenter* addressed law enforcement officers obtaining, without a warrant based on probable cause, cell site location information (CSLI) for the defendant's phone from a cell phone provider, which enabled them to develop a track of his movements and place him at certain locations at certain

---

[6] The Court also reiterated that "the fact of 'diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.'" *Carpenter*, 138 S.Ct. at 2219 (quoting *Riley v. California*, 573 U.S. 374, ___, 134 S.Ct 2473, 2488 (2014)).

times.  The Court held that "when the government accessed CSLI from the wireless carrier it invaded Carpenter's reasonable expectation of privacy in the whole of his physical movements."  *Id.* at 2219.  It also held that accessing seven days of CSLI constituted a Fourth Amendment search.  *Id.* at 2217, n.3.

The Court discussed the nature of the intrusion resulting from the ability to map the defendant's whereabouts with the 127 days of records provided.  Long-term tracking "reveal[s] not only his particular movements, but through them his 'familial, political, professional, religious, and social associates.'"  *Id.* at 2219. The Court further noted that:

> the retrospective quality of the data here gives police access to a category of information otherwise unknowable.  In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection.  With access to CSLI, the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention policies of the wireless carriers,…

*Id.* at 2218.

That it would be physically possible to follow or surveil an individual for an extended period of time did not change the calculus.  The Court recognized that extended surveillance "'was difficult and costly and therefore rarely undertaken.'" *Id.* at 2217 (quoting *Jones*).  "For that reason, 'society's expectation has been that law enforcement agents and others would not - and indeed, in the main, simply could not – secretly monitor and catalog every single movement of an individual's

16

car for a very long period.'" *Id.*

The *Carpenter/Jones* analysis recognizes that an objectively reasonable expectation of privacy does not automatically exclude anything an individual exposes to public view and, accordingly, is far more inclusive than the analysis in *Bucci*. As a more recent mode of analysis from the Supreme Court, that analysis justifies the district court's declining to view *Bucci* as binding. It also justifies upholding the district court's decision because superseding Supreme Court law provides an exception to the law of the circuit doctrine.

As the district court stated, in rejecting the government's argument that *Carpenter* had no impact on *Bucci* because the Supreme Court described its *Carpenter* holding as "narrow:"

> The Court, however, does not ground its decision on <u>Carpenter</u>'s holding but instead on its necessary reasoning; that is, a person does have some objectively reasonable expectations of privacy when in spaces visible to the public….The Court cannot reconcile that reasoning with <u>Bucci</u>'s blanket statement that no such expectations exist.

Add. 7; 381 F.Supp.3d at 145. And "though <u>Carpenter</u> does not discuss pole cameras, its logic contradicts <u>Bucci</u>'s and requires this Court to examine whether the Government's use of the Pole Camera constitutes a search." Add.8; 381 F.Supp.3d at 146.

For the reasons set out above this panel should reject the government's

argument that the district court's decision is contrary to binding precedent and no exception to the law of the circuit doctrine applies.

### C. The District Court Correctly Concluded That the Warrantless Eight Month Continuous Pole Camera Surveillance in This Case Was an Unconstitutional Search

#### 1. Ms. Moore-Bush Had a Subjective Expectation of Privacy in the Whole of Her Movements and Those of Her Family and Visitors at the Front of Her Home and in Her Driveway Over an Eight Month Period of Time

Ms. Moore-Bush resided in her mother's home at 120 Hadley Street, a house "in a quiet residential neighborhood." Add. 3,5; 381 F.Supp.3d at 141,143.  An affidavit submitted in support of a wiretap application stated that there was a large tree partially obstructing the view. G.App. 69; *see also* Add.5; 381 F.Supp.3d at 143.  That affidavit also asserted that physical surveillance would be difficult to conduct without detection. G.App. 64.

The district court found that Ms. Moore –Bush and Ms. Moore "have established that they had a subjective expectation of privacy in their and their guests' comings and goings from Moore's house."  Add.5; 381 F.Supp.3d at 143. It "infer[red] from Moore-Bush and Moore's choice of neighborhood and home within it that they did not subjectively expect to be surreptitiously surveilled with meticulous precision each and every time they or a visitor came or went from their home." Add.6; 381 F.Supp.3d at 144.

18

Although recognizing that this Court has held that a subjective expectation of privacy may be inferred from the circumstances (G.B. 25 citing *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009), the government asserts that the district court's inferences are insufficient.  It maintains that the district court erred in finding that Ms. Moore-Bush had a subjective expectation of privacy because there were no fences or hedges around the home to obscure the view from the street and the activities recorded were visible from the street.  G.B. 24-25. This contention ignores the nature of Ms. Moore-Bush's subjective expectation of privacy as described by the district court.  It was not an expectation that a passerby or a neighbor would never see her, her family members, or visitors coming to or going from the house or engaging in any activities in the driveway or front yard. It was an expectation that her, her family's and visitors' comings and goings and activity over an eight month period would not be information secretly recorded and stored for future use by law enforcement agents using a hidden camera which could zoom in on faces, license plates, and other objects.[7]  This expectation is consistent with the basic purpose of the Fourth Amendment – "'to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'"

---

[7] The government's analysis also ignores the bushes and fencing visible on the property in its own photographs from the video surveillance. *See e.g.* G.App. 154-156, 227-229

19

*Carpenter*, 138 S.Ct. at 2213. "[T]he Amendment seeks to secure 'the privacies of life' against 'arbitrary power'…[and] 'to place obstacles in the way of a too permeating police presence.'" *Id.* at 2214. *See also* Add. 4-5, 381 F.Supp.3d at 142-143.

A subjective expectation of privacy in the whole of a person's comings and goings from her home, together with the whole of the comings and goings of her family and visitors and the whole of her interactions with family and visitors in the driveway or front yard over an eight month period, does not require a ten foot wall around her property. Expecting exposure to some intrusion does not abrogate an expectation that that intrusion will be limited. As the Supreme Court stated in *Bond v. United States*, 529 U.S. 334, 338-339 (2000) (holding that a law enforcement officer's squeezing of a bus passenger's carryon violated the Fourth Amendment): "When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another. …He does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner." Similarly, while a person may expect that a passerby, or a neighbor, or even a police officer, may see what is going on in the driveway or front yard as they pass by or stand on the sidewalk, a person does not expect that even a nosy neighbor is going to be secretly continuously recording and

storing every activity for an eight month period. And even a jogger or dog walker who passes by on a regular basis is not going to be able to develop the intrusion into associational privacy and patterns of life activities developed by the continuous recorded pole camera surveillance over an eight month period.

The district court correctly found that Ms. Moore-Bush had a subjective expectation of privacy in the aggregated movements, activities, and associations of herself, family and visitors at the front of her home and in the driveway over the eight month period of surveillance.

## 2. Ms. Moore-Bush's Subjective Expectation of Privacy in the Whole of Her Movements and Those of Her Family and Visitors at The Front of Her Home and in Her Driveway Over an Eight Month Period of Time Was Objectively Reasonable

The district court's conclusion that Ms. Moore-Bush's expectation of privacy against the warrantless eight month use of the hidden pole camera here to surveil the front of her home and driveway was objectively reasonable is founded on the purposes of the Fourth Amendment set out at p.16 and the recognition that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter v. United States*, 138 S.Ct. at 2217. Moreover, the "public" nature of the front of a person's home and driveway in a quiet residential neighborhood differs from the "public" nature of a downtown or commercial district. And the use of security cameras often visible to the public and/or

21

accompanied by public notice of their use differs from the use of a hidden camera.[8] It is objectively reasonable to recognize a right to privacy against someone else surreptitiously conducting recorded, reviewable, 24/7 surveillance of activities at the front of a person's home or in her driveway in a quiet residential neighborhood while accepting the use of security camera as a person drives or walks down the street in a downtown or commercial district.

While a security camera in a downtown or commercial district may capture a small slice of a person's activity as she drives or passes by or looks into a shop window, or conducts a transaction in a business establishment, it does not capture the totality of associations and activities provided by continuous 24/7 recorded and preserved surveillance of the front of a person's home and driveway. Moreover, security cameras in downtown and commercial districts are generally visible to the public and often accompanied by notices that security cameras are in use.

Society may be willing to accept the use of security cameras in general public spaces as reasonable. That acceptance is consistent with recognizing an objectively reasonable expectation of privacy against surreptitiously recorded 24/7

---

[8] *See* discussion of the security camera and its difference from the pole camera here at Add. 7-8; 381 F.Supp.3d at 145-146.

video surveillance of the front of a home and driveway by others.[9]

The type of 24/7surveillance enabled by the pole camera here "provides a [more] intimate window into a person's life" than typical security camera surveillance.   It has the potential to reveal "not only [a person's] particular movements, but through them, his 'familial, political, professional, religious, and sexual associations.'"  *Carpenter*, 138 S.Ct. at 2217; *see also* discussion at Add.8-11; 381 F.Supp.3d 146-149.  Thus, an intrusion into protected Fourth Amendment privacy interests may also infringe on protected First Amendment freedoms of association.

The government's suggestion that there are no Fourth Amendment privacy concerns because what was recorded by the hidden pole camera could have been monitored live by law enforcement (G.B. 17) ignores the reality of the situation. As recognized in *Carpenter* and *Jones* (Alito, J. concurring), 24/7 long term in-person surveillance "was difficult and costly and therefore rarely undertaken."  138 S.Ct. at 2217; 565 U.S. at 429.  "[S]ociety's expectation has been that law enforcement agents and others would not – and indeed, in the main, simply could not – secretly monitor and catalogue every single movement of an individual's car

---

[9] That the surveillance is being conducted by someone other than the homeowner distinguishes it from a homeowner using a security camera on her own premises.

for a very long period." 138 S.Ct. at 2217; 565 U.S. at 430. That same expectation would hold for secretly monitoring and cataloging every single movement and association of an individual in the front of their home and in their driveway. The government itself recognized the unrealistic nature of 24/7 continuous in-person surveillance of the front of Ms. Moore-Bush's home and driveway in stating in its wiretap application that given the quiet residential neighborhood, physical surveillance would be difficult to conduct without detection. G.App. 64

The *Carpenter* Court and the court below also recognized the enhanced intrusion arising from the ability to review stored information. "[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection." 138 S.Ct. at 2218. *See also* Add.7, 10, 11; 381 F.Supp.3d at 145, 148, 149 (recognizing (at Add.11; 381 F.Supp.3d at 149) that the ability to review the recorded information "distinguishes this surveillance from human surveillance" and "sets the Pole Camera apart from neighbors").

The continuous and extensive nature of the 24/7, eight month long hidden surveillance here also distinguishes this case from the single time flyover of a fenced yard at issue in *California v. Ciraolo*, 476 U.S. 207, 209 (1986) and the use

24

of a beeper in a can of chloroform to track the can from one location to defendant's

residence at issue in *United States v. Knotts*, 460 U.S. 276 (1983). In *Knotts*, the

Court noted the limited use of the beeper in that case and left for a later day

whether 24 hour surveillance of a citizen would require a different analysis. That

later day has arrived and *Jones* and *Carpenter* make clear that an expectation of

privacy from the pervasive surveillance in this case is objectively reasonable.

Evaluating the factors discussed above, the district court correctly held that,

under the facts and circumstances here, Ms. Moore-Bush had an objectively

reasonable expectation of privacy and that the use of the pole camera here

constituted a search:

> [T]his Court does not rule that the use of a pole camera necessarily constitutes a search. Instead, the Court rules narrowly that several aspects of the Government's use of this Pole Camera does. Those aspects are the Pole Camera's (1) continuous video recording for approximately eight months; (2) focus on the driveway and front of the house; (3) ability to zoom inn so close that it can read license plate numbers; and (4) creation of a digitally searchable log. Taken together, these features permit the Government to piece together intimate details of a suspect's life….

Add.12; 381 F.Supp.3d at 150.

### D. The Good Faith Exception Does Not Apply

Finally, relying on *Davis v. United* States, 564 U.S. 229 (2011), the

government argues that the this Court should find that law enforcement officers

acted in good faith on this Court's decision in *Bucci* in conducting eight months of

warrantless camera surveillance.  G.B. 33-35.  The government has waived this argument.

The government did not raise good-faith in its opposition to the defendants' motions to suppress pole camera evidence.  Rather, it argued that *Bucci* was controlling and that *Carpenter* and *Jones* did not impact *Bucci*'s legal or analytical foundations.  *See* G.App. 85-91.  Nor did the government raise good faith at the non-evidentiary hearing on the motions.  *See* G.App. 93-138.  It was only after the district court issued its opinion stating that the government had waived any good-faith argument (Add. 4, n.2; 381 F.Supp.3d at 142, n.2) that the government sought to apply the good-faith exception in a motion for reconsideration.  G.App. 139.  In denying the government's motion for reconsideration the court stated that "the government neglects to explain to the Court why the Court ought excuse the Government's waiver of its argument that the good faith exception to the exclusionary rule applies."  Add. 14.

The government's reliance on *United States v. Tanco-Pizarro*, 892 F.3d 472, 479 (1st Cir. 2018) is misplaced.  *Tanco-Pizarro* applied plain error review to claims raised initially in a motion for reconsideration despite saying that "arguments unveiled for the first time are not preserved for appeal."  However, there was no waiver finding in the district court in that case.  The government does

not address the district court's finding of waiver in this case and its reiteration of that finding in the denial of the motion for reconsideration. Moreover, in *United States v. McNicol*, 829 F.3d 77, 83 n.2 (1st Cir. 2016) this Court held that a theory raised for the first time in a motion for reconsideration was waived.

Even if not waived, the government has failed to establish that the good-faith exception should be found applicable. "The government bears the 'heavy burden' of proving that the good-faith exception applies,…" *United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013). There is a factual component to a good faith claim involving an officer's own good faith basis, or lack thereof, for his actions. In *United States v. Ramirez-Rivera*, 800 F.3d 1, 31-33 (1st Cir. 2015) this Court explained that the good faith exception would not apply to a warrantless search where the officer had testified that he had not sought a warrant because it required conducting surveillance, taking photographs and videos, and "the process gets complicated." 800 F.3d at 32. As the Court stated: "the law instructs that '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value is strong and tends to outweigh the resulting costs.'…So is the case here." 800 F.3d at 33.

Here, the government presented no evidence in the district court to support its belated claim that the officers installing and operating the pole camera during its

27

eight months of surveillance relied in good faith on *Bucci*. The government's good-faith argument in its motion for reconsideration (G.App.145-146) simply asserted that the *Davis* good faith exception applied based on this Court's decision in *Bucci*. It said nothing about the reason for the officers' actions in installing the pole camera and conducting surveillance for eight months without a warrant; it did not request an evidentiary hearing to provide a factual predicate for its claim. Nor did it present anything concerning the officers' reasons at the non-evidentiary hearing on the motion to suppress; indeed, it did not raise good-faith at that time. The government has not established error in the district court's finding waiver and rejecting the government's belated and insufficient good faith argument. For this reason as well, the good-faith exception does not apply in this case even under plain error review.

## CONCLUSION

For the forgoing reasons the district court's granting of the motion to suppress should be affirmed.

Dated: October 23, 2019                    Respectfully submitted,
                                           Nia Moore-Bush
                                           By her attorney:
                                           */s/Judith H. Mizner*
                                           Judith H. Mizner, AFPD
                                           Identification No.: 11056
                                           Federal Defender Office
                                           District of Massachusetts
                                           51 Sleeper Street, 5th Floor
                                           Boston, MA 02210
                                           (617) 223-8061

29

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Judith Mizner, hereby certify that the foregoing brief of appellee Nia Moore-Bush complies with the type-volume limitation of FRAP 32(a)(7).

1.  The brief contains 6,360 words excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2.  The brief has been prepared in a proportionally spaced typeface using Word 2016 in 14 point Times New Roman.

*/s/Judith H. Mizner*
Judith Mizner

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to Randall E. Kromm, Amy H. Burkart, Katherine A. Wagner, and Cynthia A. Young as identified on the Notice of Electronic Filing (NEF) on October 23, 2019

*/s/Judith H. Mizner*
Judith H. Mizner

<u>**ADDENDUM – TABLE OF CONTENTS**</u>

*United States v. Moore Bush*,
    381 F. Supp. 3d 139 (D. Mass. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 1

United States District Court's Denial of Motion for Reconsideration (D.E. 424),
    (June 5, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 13

agreement without authority." (quotation marks and citation omitted)). Further, the necessity of the NOA is also demonstrated by testimony at arbitration. For instance, MTC's General Counsel Philip Holahan testified that "the guaranty is critical to the operation of the network." (Docket No. 245-18, at 3). Circumstantial evidence further underscores the importance of the Guaranty. As noted above, at the hearing on these motions, MTC's counsel noted that the re-written "contract is with a shell entity that is in bankruptcy on a major public network that has four more years to go on the contract and no guaranty from the parent." (Docket No. 282, at 22).

This conclusion is further supported by the language of the Guaranty agreement itself, which the arbitrator seems to have overlooked. For instance, the agreement notes:

> This Agreement and the liability hereunder shall not be affected or impaired by any compromise, settlement, release, renewal, extension, indulgence, changing or modification of any of the obligations and liabilities of the Network Operator under the Network Operator Agreement, or by any failure on the part of MTC, its successors or assigns, to realize upon any obligations or liabilities of Network Operator.

(Docket 1-19 § 2.3).

**[18]** An arbitrator exceeds his powers under section 10 when he reforms material terms of a contract so that the agreement conforms with his own sense of equity or justice. *Stolt-Nielsen*, 559 U.S. at 671, 130 S.Ct. 1758 ("[W]hen an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice . . . his decision may be unenforceable" under section 10(4) of the FAA (quotation marks and citation omitted)); *Steward Holy Family Hosp., Inc. v. Mass. Nurses Assoc.*, 350 F.Supp.3d 7, 14 (D. Mass. 2018) (overturning arbitration award where "the arbitrator was prescribing his own brand of industrial justice in violation of the plain terms of the contract"). Accordingly, I find that the arbitrator exceeded his authority here.

### Conclusion

For the reasons stated above, MTC's motion to vacate in part and modify the arbitration award (Docket No. 243) is *__granted__* and Axia's motion to confirm the award (Docket No. 241) is *__denied__*. The arbitrator's award is *__vacated__*.

**SO ORDERED**



### UNITED STATES of America

#### v.

### Nia MOORE-BUSH and Daphne Moore, Defendants.

### CRIMINAL ACTION NO. 3:18-30001-WGY

United States District Court, D. Massachusetts.

Filed 06/03/2019

As Amended 06/04/2019

**Background:** Defendants moved to suppress evidence that government collected using video camera installed on utility pole across the street from defendant's house.

**Holding:** As matter of first impression, the District Court, William G. Young, J., held that pole camera's eight-month video log of defendant's house constituted search.

Motions granted.

**1. Criminal Law ⟺392.4(2)**

Although there are some exceptions, courts exclude evidence that federal officers obtain using a search that violates the Fourth Amendment. U.S. Const. Amend. 4.

**2. Searches and Seizures ⟺13.1**

Under the reasonable expectations test, a search occurs whenever the government intrudes upon any place in which a person has a reasonable expectation of privacy. U.S. Const. Amend. 4.

**3. Searches and Seizures ⟺26, 192.1**

To show that a search occurred under the reasonable expectations test, each defendant has the burden of showing that (1) she exhibited an actual, subjective expectation of privacy and (2) her subjective expectation is one that society is prepared to recognize as objectively reasonable. U.S. Const. Amend. 4.

**4. Searches and Seizures ⟺21**

Pole camera's eight-month video log of defendant's house constituted search under Fourth Amendment; use of pole camera invaded defendants' objectively reasonable expectations of privacy in their and their guests' activities around front of house, camera had continuous video recording, focused on driveway and front of house, was able to zoom in so close that it could read license plate numbers, and created digitally searchable log, and features permitted government to piece together intimate details of defendants' lives. U.S. Const. Amend. 4.

**5. Searches and Seizures ⟺25.1**

At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. U.S. Const. Amend. 4.

———

Katharine Wagner, United State's Attorney's Office, Springfield, MA, for Plaintiff.

Linda J. Thompson, Thompson & Thompson, Thomas J. O'Connor, Jr., Springfield, MA, for Defendants.

## AMENDED MEMORANDUM AND ORDER *

WILLIAM G. YOUNG, DISTRICT JUDGE

### I. INTRODUCTION

Casual observations of a person's forays in and out of her home do not usually fall within the Fourth Amendment's protections. Here, the defendants ask the Court to consider whether a precise video log of the whole of their travels in and out of their home over the course of eight months, created by a camera affixed to a utility pole that could also read the license plates of their guests, raises Fourth Amendment concerns. After a thorough analysis of the parties' arguments and recent Supreme Court authority, the Court rules that it does. Accordingly, the Court ALLOWS the defendants' motions to suppress, ECF Nos. 326, 358.

### II. BACKGROUND

#### A. Procedural History

A federal grand jury indicted defendant Nia Moore-Bush ("Moore-Bush") on January 11, 2018. ECF No. 3. Almost a year later, on December 20, 2018, the grand jury returned a superseding indictment

* This amended memorandum and order deletes a superfluous word in footnote 5 and corrects a citation in section IV.B.2.

naming defendant Daphne Moore ("Moore"), Moore-Bush's mother, as well. ECF No. 206. Moore and Moore-Bush moved on April 22 and May 2, 2019, respectively, to suppress evidence that the Government collected using a video camera installed on a utility pole across the street from Moore's house (the "Pole Camera").[1] See Def. Daphne Moore's Mot. Suppress ("Moore Mot."), ECF No. 326; Def. Nia Moore-Bush's Mot. & Mem. Suppress ("Moore-Bush Mot."), ECF No. 358. Moore-Bush and Moore argue that the Government's use of the Pole Camera constituted a search under the Fourth Amendment to the United States Constitution. See generally Moore Mot.; Moore-Bush Mot. The Government opposed the motions to suppress on May 6, 2019. Government's Opp'n Defs.' Mots. Suppress Pole Camera Evidence ("Gov't Opp'n"), ECF No. 367.

On March 13, the Court heard oral argument on the motion and took it under advisement. Electronic Clerk's Notes, ECF No. 396. For the following reasons, the Court ALLOWS the motions to suppress.

### B. Facts

The Court draws the facts from the parties' undisputed statements at the motion hearing and in their briefing.

The Government installed the Pole Camera on a utility pole across from Moore's house, located at 120 Hadley Street, Springfield, Massachusetts. Gov't Opp'n 1. The Pole Camera captured video of, but not audio from, events occurring near the exterior of Moore's house for approximately eight months. Gov't Opp'n 2; Tr. 15:4, ECF No. 414. During this time,

Moore-Bush resided in Moore's house. Gov't Opp'n 1.

The Pole Camera surveilled the driveway and part of the front of Moore's house. Tr. 34:13-15; Gov't Opp'n 2, 4. A tree partially obscured its view. Gov't Opp'n 2. Although the Pole Camera could zoom in so as to permit law enforcement officers to read license plates, it could not peer inside windows. Tr. 26:5-22. Law enforcement officers also could pan and tilt the camera. Gov't Opp'n 3. Additionally, law enforcement officers could operate the Pole Camera's zoom feature remotely. Tr. 13:19-14:14. The Pole Camera produced a digitized recording that the Government could search. Tr. 16:2-16.

Although the Government has not stated the exact nature of the evidence that it seeks to admit from the Pole Camera, the parties assume that the Government will introduce video, much of it the Pole Camera recorded well into its eight-month existence. Tr. 20:5-23, 35:1-14.

### III. LEGAL FRAMEWORK

Moore-Bush and Moore argue that the Pole Camera's eight-month video log of Moore's house constitutes an unconstitutional search. Moore-Bush Mot. 1; Moore Mot. 1.

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

1. Defendant Oscar Rosario also moved to suppress the Pole Camera's video, ECF Nos. 321 & 332, but he pled guilty on May 13,

2019, thereby obviating resolution of his motion, ECF No. 393.

**[1]** The Government does not justify its use of the Pole Camera with a warrant or probable cause. See generally Gov't Opp'n. Instead, it insists that its use of the Pole Camera does not amount to a search. Id. at 2. Consequently, as the parties have presented this case, the use of the Pole Camera violates the Fourth Amendment if its operation constitutes a search. Although there are some exceptions -- none of which the Government invokes here [2] -- courts exclude evidence that federal officers obtain using a search that violates the Fourth Amendment. See United States v. Dedrick, 840 F. Supp. 2d 482, 492 (D. Mass. 2012) (citing Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

The Supreme Court has formulated two tests for analyzing whether the Government has conducted a Fourth Amendment "search." See United States v. Bain, 874 F.3d 1, 11-12 (1st Cir. 2017). For one, "[u]nder the common law trespassory test," a Fourth Amendment search occurs "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects." Id. at 12 (quoting Florida v. Jardines, 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013)). In this case, neither Moore-Bush nor Moore assert that a search occurred under the common law trespassory test. See generally Moore-Bush Mot.; Moore Mot.

**[2, 3]** Instead, they rely on the "reasonable expectations test." See id.; Bain, 874 F.3d at 12. Under this test, "a search occurs whenever the government intrudes

upon any place in which a person has a 'reasonable expectation of privacy.'" Bain, 874 F.3d at 12 (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). To show that a search occurred under this test, then, each defendant has the burden of showing that (1) she "exhibited an actual, subjective expectation of privacy" and (2) her "subjective expectation is one that society is prepared to recognize as objectively reasonable." See United States v. Morel, 922 F.3d 1, 8 (1st Cir. 2019) (quoting United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009); United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016)).

Although the reasonable expectations test represents a relatively recent doctrinal innovation, the Supreme Court has taught that the public's understanding of unreasonable searches at the Fourth Amendment's framing informs the test's application. See Carpenter v. United States, ─── U.S. ───, 138 S. Ct. 2206, 2214, 201 L.Ed.2d 507 (2018) (quoting Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). The Supreme Court thus has identified two "basic guideposts" from history: "First, that the [Fourth] Amendment seeks to secure 'the privacies of life' against 'arbitrary power.' Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" Id. (quoting Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29

---

**2.** For instance, the Government might have argued that the good faith exception to the exclusionary rule applies to its use of the Pole Cameras. See Davis v. United States, 564 U.S. 229, 239, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (holding that the exclusionary rule does not apply "when the police conduct a search in objectively reasonable reliance on binding judicial precedent"). It did not. Accordingly, the Government did not carry its

"'heavy burden' of proving that the good-faith exception applies." See United States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013) (quoting United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005)), aff'd sub nom. Riley v. California, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). The Government thereby waived that argument. See United States v. Ramirez-Rivera, 800 F.3d 1, 32 (1st Cir. 2015).

L.Ed. 746 (1886); United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948)). These timeless guideposts point the Court on its way towards resolving this motion.

## IV. ANALYSIS

The Court ALLOWS Moore-Bush and Moore's motion to suppress because they have exhibited an actual, subjective expectation of privacy that society recognizes as objectively reasonable. See Morel, 922 F.3d at 8. First, the Court infers from their choice of neighborhood that they subjectively expected that their and their houseguests' comings and goings over the course of eight months would not be surreptitiously surveilled. See Moore Mot. 7. Second, the Court rules that the Pole Cameras collected information that permitted the Government to peer into Moore-Bush and Moore's private lives and constitutionally protected associations in an objectively unreasonable manner. See United States v. Jones, 565 U.S. 400, 415, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring).

### A. Subjective Expectation of Privacy

Moore-Bush and Moore have established that they had a subjective expectation of privacy in their and their guests' comings and goings from Moore's house.

As a preliminary matter, the Government suggests that, to establish this prong of the test, Moore-Bush and Moore needed to file affidavits or otherwise testify to their expectations. See Gov't Opp'n 4 (cit-

ing United States v. Ruth, 65 F.3d 599, 604-05 (7th Cir. 1995)). The First Circuit requires nothing of the sort: In United States v. Rheault, the First Circuit rejected a similar suggestion and instead inferred a subjective expectation of privacy from the defendant's actions. 561 F.3d at 59. The Court thus analyzes whether Moore-Bush and Moore have manifested a subjective expectation of privacy through the relevant actions that they took.

Moore-Bush and Moore contend that they have established a subjective expectation of privacy by choosing to live in a quiet, residential neighborhood in a house obstructed by a large tree. Moore Mot. 7.[3] The Government maintains that this amounts to insufficient "conjecture" and "speculation." Gov't Opp'n 4-5. Further, the Government tries to turn Moore-Bush and Moore's tree argument around on them: It insists that the tree "miminiz[ed] any potential intrusion." Id. at 5.

The Government sidesteps Moore-Bush and Moore's asserted privacy interest: it focuses on whether Moore-Bush and Moore had a broader privacy interest in the front of their house. See Gov't Opp'n 4. Construed broadly, perhaps they did not. See California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (observing that law enforcement officers need not "shield their eyes when passing by a home on public thoroughfares").

Yet that is not the narrower privacy interest that Moore-Bush and Moore assert here. Instead, Moore-Bush and Moore

---

**3.** The Court imputes Moore's expectations to Moore-Bush. See Minnesota v. Olson, 495 U.S. 91, 99-100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (observing that "an adult daughter temporarily living in the home of her parents" has an expectation of privacy in her parents' home). In opposing the motion, it seems that the Government does so, too. See Gov't Opp'n 4 (stating "by pointing out just

the tree, Defendants effectively acknowledge that there are no fences, shrubs, or other constructions that suggest that the inhabitants meant to shield the front of the house or driveway from public view" but then stating that "[t]he Defendant, however, uses the reference . . . to the solitary tree") (emphasis added).

claim that they expected privacy in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house. Moore Mot. 9-10; Moore-Bush Mot. 5. The Court infers from Moore-Bush and Moore's choice of neighborhood and home within it that they did not subjectively expect to be surreptitiously surveilled with meticulous precision each and every time they or a visitor came or went from their home.

Therefore, the Court rules that Moore-Bush and Moore meet the first prong of the reasonable expectations test. See United States v. Childs, Crim. A. No. 06-10339-DPW, 2008 WL 941779, at *7 (D. Mass. Apr. 4, 2008) (Woodlock, J.) (inferring from "circumstantial evidence" that the defendant "had a subjective expectation of privacy").

### B. Objectively Reasonable Expectation of Privacy

Moore-Bush and Moore's expectation of privacy "is one that society is prepared to recognize as objectively reasonable." See Morel, 922 F.3d at 8.

The First Circuit previously approved the use of a pole camera in United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009). Bucci, however, no longer binds this Court in light of subsequent Supreme Court precedent undermining it. See Carpenter, 138 S. Ct. at 2217-18. Consequently, this Court considers the issue as matter of first impression and rules that the surveillance conducted here exceeds the objectively reasonable expectation of privacy of the public at the time of the Fourth Amendment's framing. See id. at 2214.

### 1. Bucci Does Not Control

Moore-Bush and Moore offer two reasons why Bucci ought not dictate the outcome here. First, they claim that Bucci's holding is limited to the camera that the Government used there, which had fewer capabilities than this Pole Camera. Moore-Bush Mot. 2-3; Moore Mot. 7. Second, they argue that Carpenter changed the law and requires a different result. Moore-Bush Mot. 3-6; Moore Mot. 8-12. The Court disagrees with Moore-Bush and Moore's first contention and agrees with their second.

True, the First Circuit noted some factual distinctions between the camera in Bucci and the Pole Camera here. Although the camera in Bucci pointed at the front of a house for eight months, law enforcement officers lacked the capability to control the camera remotely "without being physically at the scene."[4] 582 F.3d at 116. That distinction is too thin to distinguish Bucci from this case, however, especially in light of the legal rules that the First Circuit applied. In Bucci, the First Circuit reasoned that the "legal principle" that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public" disposed of the matter. Id. at 116-17 (citing Katz, 389 U.S. at 351, 88 S.Ct. 507). If that principle remains an accurate depiction of the law, Moore and Moore-Bush lack an objectively reasonable expectation of privacy in the activities just outside their home, regardless of the camera's unique capabilities.

The Court reads Carpenter, however, to cabin -- if not repudiate -- that principle. There, the Supreme Court stated that: "A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be

---

**4.** It is unclear whether the law enforcement officers in Bucci could pan or zoom that

camera when physically at the scene. 582 F.3d at 116.

constitutionally protected.' " Carpenter, 138 S. Ct. at 2217 (quoting Katz, 389 U.S. at 351-52, 88 S.Ct. 507). What's more, the Supreme Court recognized that long-term tracking of a person's movements "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.' " Id. (quoting Jones, 565 U.S. at 415, 132 S.Ct. 945 (Sotomayor, J., concurring)); see also United States v. Garcia-Gonzalez, Crim. A. No. 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (Sorokin, J.) (observing that Justices Alito and Sotomayor's concurrences in Jones "undermine Bucci's legal [and] analytic foundations"). Additionally, the Supreme Court distinguished the tracking involved in Carpenter from historical surveillance methods on the ground that the tracking produced a log that law enforcement officers could use to "travel back in time to retrace a person's whereabouts" whereas "a dearth of records and the frailties of recollection" limited surveillance in the past. 138 S. Ct. at 2218.

The Government protests that the Supreme Court characterized its holding in Carpenter as "narrow" and thus limited to the technology addressed in that case, cell-site location information. Gov't Opp'n 6 (quoting Carpenter, 138 S. Ct. at 2217, 2219). The Court, however, does not ground its decision on Carpenter's holding but instead on its necessary reasoning; that is, a person does have some objectively reasonable expectations of privacy when

in spaces visible to the public. See 138 S. Ct. at 2217. The Court cannot reconcile that reasoning with Bucci's blanket statement that no such expectations exist. See 582 F.3d at 117.[5]

The Government also brings to this Court's attention two out-of-circuit district courts' rejections of post-Carpenter challenges to pole cameras. Gov't Opp'n 6 (citing United States v. Kay, No. 17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018); United States v. Kubasiak, No. 18-CR-120, 2018 WL 6164346 (E.D. Wis. Aug. 23, 2018), report and recommendation adopted 2018 WL 4846761 (Oct. 5, 2018)). Nevertheless, in each of those cases -- and the two others that this Court located -- the district courts premised their approval of the pole cameras in large part on the claim that those cameras were "security cameras." See Kubasiak, 2018 WL 6164346, at *4 (basing its reasoning on the Supreme Court's emphasis in Carpenter that it did not "call into question conventional surveillance techniques and tools, such as security cameras" (quoting 138 S. Ct. at 2220)); Kay, 2018 WL 3995902, at *2 (same); United States v. Tirado, No. 16-CR-168, 2018 WL 3995901, at *2 (E.D. Wis. Aug. 21, 2018) (same); United States v. Tuggle, No. 16-CR-20070-JES-JEH, 2018 WL 3631881, at *3 (CD. Ill. July 31, 2018) (same).

This Pole Camera is not a security camera by any stretch of the imagination. As relevant here, Merriam-Webster defines security as "something that secures . . .

---

5.  One possible route to reconcile the First Circuit's pronouncement in Bucci with the Supreme Court's reasoning in Carpenter would be to distinguish between real-time observations of the front of a house and a video log recording them. See Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at 116-17. The First Circuit, however, did not specify whether law enforcement officers monitored the camera used in Bucci contemporaneously or reviewed

digitized recordings afterwards. See Bucci, 582 F.3d at 116-17. The Court explains in section IV.B.2 why, at least, the latter scenario sparks severe Fourth -- and First -- Amendment concerns. The Court therefore reads Carpenter to overrule Bucci to the extent that Bucci sanctioned constant law enforcement video logging of activities outside a home for eight months. See Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at 116-17.

measures taken to guard against espionage or sabotage, crime, attack, or escape." Security, Merriam-Webster, https://www.merriam-webster.com/dictionary/security (last accessed May 15, 2019); see also Security, Black's Law Dictionary (10th ed. 2014) ("The quality, state, or condition of being secure, esp. from danger or attack."). Law enforcement officers did not install the Pole Camera here "to guard against . . . crime," but to investigate suspects. Indeed, the prototypical security camera exists to monitor a heavily trafficked area or commercial establishment. Security camera operators often install their cameras in plain view or with warning signs to deter wrongdoers. See, e.g., Commonwealth v. Rivera, 445 Mass. 119, 133-34, 833 N.E.2d 1113 (2005) (Cowin, J.) (observing, in a different context, that a defendant should have expected that a "standard security surveillance camera mounted by the store owner in plain view" would record him). The Government hid the Pole Camera out of sight of its targets and does not suggest that it did so to prevent criminal activity. Instead, the Government explained that it used the Pole Camera simply to track suspects' travels, which, standing alone, were not crimes. See Defs.' Exs. Pretrial Mots., Ex. 2 at 132 (describing the installation of Pole Camera and explaining that it "proved to be useful in identifying several vehicles visiting" Moore-Bush, "confirm[ing] when MOORE-BUSH [was] in the Springfield area," and "identifying rental vehicles used by MOORE-BUSH").[6] Accordingly, though Carpenter does not discuss pole cameras, its logic contradicts Bucci's and requires this Court to examine whether the Government's use of the Pole Camera constitutes a search.

## 2. The Use of the Pole Camera Invaded Moore-Bush and Moore's Objectively Reasonable Expectations of Privacy

[4]  In light of the principles that the Supreme Court elucidated in Carpenter, this Court holds that Moore-Bush and Moore had an objectively reasonable expectation of privacy in their and their guests' activities around the front of the house for a continuous eight-month period. See 138 S. Ct. at 2213-14, 2217-18.

In Garcia-Gonzalez, Judge Sorokin came close to suppressing video from a pole camera similar to the one here on the basis of Jones but ultimately pulled back. 2015 WL 5145537, at *9. Jones addressed whether the Government could surreptitiously attach a location tracking device to a car. 565 U.S. at 402, 132 S.Ct. 945. Although the opinion of the Court invalidated the tracking under the common law trespassory test, Justices Alito and Sotomayor filed concurrences that applied the reasonable expectations test, which, combined, obtained the support of a majority of the justices. 565 U.S. at 413-31, 132 S.Ct. 945. Judge Sorokin noted this apparent Supreme Court majority and observed that extended pole camera surveillance raised more serious concerns than the location tracking in Jones:

> [T]he two concurrences in Jones, emphasized that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." Justice Sotomayor remarked that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associates." . . . GPS data provides only the "where" and "how long" of a person's public

---

**6.**  Moore-Bush and Moore manually filed their exhibits, so the exhibits do not appear on the

electronic court filing system.

movements insofar as the person remains close to the monitored vehicle. Long-term around-the-clock monitoring of a residence chronicles and informs the "who, what, when, why, where from, and how long" of a person's activities and associations unfolding at the threshold adjoining one's private and public lives. Garcia-Gonzalez, 2015 WL 5145537, at *8 (quoting Jones, 565 U.S. at 414, 132 S.Ct. 945 (Sotomayor, J., concurring)). Nevertheless, Judge Sorokin viewed himself bound to apply Bucci's reasoning because neither Justice Alito nor Justice Sotomayor spoke for the Supreme Court in Jones. Garcia-Gonzalez, 2015 WL 5145537, at *9.

The Supreme Court's Carpenter decision, however, incorporates the Jones concurrences. See, e.g., Carpenter, 138 S. Ct. at 2215 (quoting with approval Justices Alito and Sotomayor's conclusion that "'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy' -- regardless whether those movements were disclosed to the public at large"); id. at 2217 (quoting Justice Alito's concurrence stating that "[p]rior to the digital age, law enforcement officers might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken'"); id. at 2220 (citing Justices Alito and Sotomayor's Jones concurrences that a search occurs when the Government subjects a vehicle to "pervasive tracking" on public roads). As a consequence, this Court interprets Carpenter to apply the Jones concurrences. This Court thus applies the principles from Carpenter and the Jones concurrences to the Pole Camera here.

In the Court's view, three principles from the Jones concurrences and Carpenter dictate the resolution of this motion. First, as Justice Sotomayor points out in Jones, "[a]wareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse." 565 U.S. at 416, 132 S.Ct. 945.[7] Second, as Chief Justice

---

7. The Supreme Court has long instructed magistrates to consider First Amendment values in analyzing whether a warrant's proposed search is reasonable. See Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (in "determining the reasonableness of a search, state and federal magistrates should be aware that 'unrestricted power of search and seizure could also be an instrument for stifling liberty of expression.'" (quoting Marcus v. Search Warrant, 367 U.S. 717, 729, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961))). The Fourth Amendment's framers recalled the use of general warrants that the King used to harass and persecute Catholic and Puritan publishers. Stanford v. Texas, 379 U.S. 476, 482, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). A line of cases establishes that when a magistrate analyzes a warrant application for expressive material, as opposed to physical contraband such as "weapons or drugs," the magistrate must review the application "with 'scrupulous exactitude.'" New York v. P.J. Video, Inc., 475 U.S. 868, 871, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986) (quoting Stanford, 379 U.S. at 481-85, 85 S.Ct. 506).

As far as this Court can tell, Jones and Carpenter represent the first cases in which the Supreme Court instructed courts to consider First Amendment values in deciding whether a search occurred at all. See United States v. Sparks, 750 F. Supp. 2d 384, 387 n.5 (D. Mass. 2010) (pre-Jones, rejecting the defendant's arguments that "evidence must be excluded because the government violated his First Amendment right to free association"). Indeed, in Katz, Justice Stewart's opinion for the Supreme Court -- upon which courts seldom now rely in favor of Justice Harlan's concurrence -- takes pains to differentiate the spheres of protection provided by the First and Fourth Amendments. 389 U.S. at 350-51 & n.5, 88 S.Ct. 507. The Court views the addition of First Amendment principles to the Katz reasonable expectations test as a welcome development in Fourth Amendment law. See Rachel Levinson-Waldman, Hiding

Roberts observes in Carpenter, technologies that permit law enforcement officers to access and search vast amounts of passively collected data may "give police access to a category of information otherwise unknowable." See 138 S. Ct. at 2218. Third, as Justice Alito reasons in Jones, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer-term GPS monitoring in investigations of most offenses impinges on expectations of privacy." 565 U.S. at 430, 132 S.Ct. 945 (citing United States v. Knotts, 460 U.S. 276, 281-82, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983)).

The surveillance here risks chilling core First Amendment activities. Consider religious dissenters. Surely the public at the time of the Fourth Amendment's framing would be familiar with the dissenting religious groups that objected to the Church of England's practices, such as the Methodists, Pilgrims, Puritans, and Quakers. After Parliament enacted the Act of Uniformity, which compelled all Englishmen to attend Church of England services and criminalized "conduct[ing] or attend[ing] religious gatherings of any other kind," religious dissenters continued to hold their worship gatherings in secret. See Engel v. Vitale, 370 U.S. 421, 432-33, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Many of those gatherings took place in private homes to avoid prosecution -- often unsuccessfully. See id.; John C. English, John Wesley and the Rights of Conscience, 37 J. Church & St. 349, 350, 360 (1995) (noting that early Methodist ministers preached in private houses notwithstanding the risk that magistrates would fine them for violating the Conventicle Act); see also Church of the

in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public, 66 Emory L.J. 527, 552, 557 (2017);

Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 530-31, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (striking down city ordinance outlawing religious practice that took place in secret); Congregation Jeshuat Israel v. Congregation Shearith Israel, 186 F. Supp. 3d 158, 169 (D.R.I. 2016) (recounting that the first Jewish families to emigrate to the colonies "met to worship at private dwelling houses"), rev'd, 866 F.3d 53 (1st Cir. 2017) (not disturbing this finding of fact). It stands to reason that the public at the time of the amendment's framing would have understood the King's constables to violate their understanding of privacy if they discovered that constables had managed to collect a detailed log of when a home's occupants were inside and when visitors arrived and whom they were.

What's more, people use their homes for all sorts of liaisons. For example, the Government has no business knowing that someone other than the occupant's spouse visited the home late at night when the spouse was away and left early in the morning. See Lawrence v. Texas, 539 U.S. 558, 574, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (reconfirming that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" (citing Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). Nor does the Government have any business tracking a homeowner's hobbies or regular trips for appointments. Perhaps people would hesitate to have supporters of opposition political parties visit if they knew that the Government might be monitoring their driveway. The continuous video tak-

Daniel J. Solove, The First Amendment As Criminal Procedure, 82 N.Y.U. L. Rev. 112, 127-28 (2007).

en by the Pole Camera thus threatens to chill these religious, political, and associational activities. See U.S. Const. amend. I; Jones, 565 U.S. at 416, 132 S.Ct. 945 (Sotomayor, J., concurring) ("Awareness that the Government may be watching chills associational and expressive freedoms.").

Moreover, the video from the Pole Camera was not only continuous, but also recorded and digitized. Thus, even if the Government were to show no contemporaneous interest in these intimate personal details, the Government can go back on a whim and determine a home occupant's routines with to-the-second specificity. See Carpenter, 138 S. Ct. at 2218. This capability distinguishes this surveillance from human surveillance. Humans are imperfect note-takers and not all blessed with photographic memory. See id. The Pole Camera, however, captured every single second that passed over eight months in a digitally searchable form. Information that a law enforcement officer might have ignored at the time as irrelevant to the investigation or mis-recorded no longer prevents the Government's prying eyes from wandering. See id. This power also sets the Pole Camera apart from neighbors; even -- or perhaps especially -- on a residential street, neighbors notice each other's peculiar habits. Yet they would not notice all of their neighbors' habits, especially those activities occurring during traditional working hours or in the dark.

[5] While Jones involved a car on a public road, Justice Alito's conclusion that society reasonably expects to be free from long-term surveillance in public applies with equal force to society's reasonable expectations about the public space in front of a person's home. See 565 U.S. at 430, 132 S.Ct. 945. Indeed, Fourth Amendment doctrine treats the home with due reverence. " 'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Here, for eight months, the Government monitored every single time that Moore-Bush and Moore retreated into their home, thereby impairing their freedom to retreat as they pleased.

While the Government neither trespassed onto Moore's home's curtilage nor peeked inside her home, the Court is sensitive to the different expectations people reasonably may have about activities on their driveway and near their front door. Cf. Jardines, 569 U.S. at 7-9, 133 S.Ct. 1409 (applying the common law trespassory test to a home's curtilage, limiting the "implicit license" permitting visitors to approach a home's front door). Although these activities, taken one by one, may not give rise to a reasonable expectation of privacy, as on the public roads, the Court aggregates their sum total for its analysis. In Jones, a majority of justices reasoned that law enforcement officers conducted a search when they surveilled a car for four weeks. 565 U.S. at 413-14, 132 S.Ct. 945 (Sotomayor, J., concurring). Here, law enforcement officers surveilled the home for eight months. A home occupant would not reasonably expect that. While the law does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares," Ciraolo, 476 U.S. at 213, 106 S.Ct. 1809 (emphasis added), it does forbid the intrusive, constant surveillance here.

The Government counters that it has long used pole camera technology to surveil suspects at home. This Pole Camera, however, is unique in this Court's experience. As discussed above, this Pole Cam-

**150**            381 FEDERAL SUPPLEMENT, 3d SERIES

era did not require monitoring in real time because the Pole Camera created a digitally searchable log. The Government provides no evidence that pole cameras have long had this capability. Moreover, the Court observes that in three of the four post-Carpenter cases and in Bucci the Government could not magnify images without traveling to the scene. See Kay, 2018 WL 3995902, at *2; Tirado, 2018 WL 3995901, at *2; Tuggle, 2018 WL 3631881, at *3; Bucci, 582 F.3d at 116. Law enforcement officers could also pan and tilt this camera. The ability to take all these action from afar, potentially using a cellphone or tablet computer, seems to be a new development. Compare Gov't Opp'n 3 & n.1 with Moore Mot. 6.

Therefore, the Court holds that the Pole Camera, as used here, does not constitute a "conventional security technique[.]" Carpenter, 138 S. Ct. at 2220. Accordingly, Moore-Bush and Moore meet the second prong of the reasonable expectations test.[8]

## V. CONCLUSION

In sum, this Court does not rule that the use of a pole camera necessarily constitutes a search. Instead, the Court rules narrowly that several aspects of the Government's use of this Pole Camera does.

Those aspects are the Pole Camera's (1) continuous video recording for approximately eight months; (2) focus on the driveway and front of the house; (3) ability to zoom in so close that it can read license plate numbers; and (4) creation of a digitally searchable log. Taken together, these features permit the Government to piece together intimate details of a suspect's life. See Carpenter, 138 S. Ct. at 2217 (quoting Jones, 565 U.S. at 415, 132 S.Ct. 945 (Sotomayor, J., concurring)).

Therefore, the Court ALLOWS Moore-Bush and Moore's motions to suppress evidence obtained directly from the Pole Camera, ECF Nos. 326, 358. Although Moore-Bush and Moore say that the Pole Camera may have led to the discovery of other tainted evidence, they do not identify that evidence for the Court. The Court thus takes no action with regard to evidence collected indirectly from the Pole Camera.[9]

**SO ORDERED.**



---

8. While beyond the record here, it is worth noting that "[p]olice surveillance equipment (including both dashboard cameras and body cameras) has become both cheaper and more effective . . . ." United States v. Paxton, 848 F.3d 803, 812 (7th Cir. 2017); see also Farhad Manjoo, San Francisco Is Right: Facial Recognition Must Be Put On Hold, N.Y. Times (May 16, 2019), https://www.nytimes.com/2019/05/16/opinion/columnists/facial-recognition-ban-privacy.html (noting, among other things, that cameras "keep getting cheaper and -- in ways both amazing and alarming -- they are getting smarter"); Jones, 565 U.S. at 415-16, 132 S.Ct. 945 (Sotomayor, J., concurring) (observing that "because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design,

proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: ''limited police resources and community hostility.'' (quoting Illinois v. Lidster, 540 U.S. 419, 426, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004)). Although this Court's decision does not rely on this trend, it appears beyond serious debate that the costs of pole camera surveillance have shrunk significantly, thereby tilting any cost-benefit calculation that the Government might perform in favor of using that technique.

9. A preliminary review of the record before this Court indicates that the independent source exception may preclude suppression of any other evidence. See United States v. Flores, 888 F.3d 537, 546 (1st Cir. 2018)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA            )
                                    )
            v.                      )            CRIMINAL ACTION
                                    )            NO. 3:18-30001-WGY
NIA MOORE-BUSH and                  )
DAPHNE MOORE,                       )
                                    )
                  Defendants.       )
_____)

YOUNG, D.J.                                      June 5, 2019

**ORDER**

After a careful review of the Government's motion for
reconsideration, ECF No. 423, the Court DENIES the Government's
motion.  Though the Government now seeks to suggest that
defendants Nia Moore-Bush and Daphne Moore lacked a subjective
expectation of privacy because the tree in front of their home
lacked leaves during much of the surveillance, this new argument
flatly contradicts the Government's earlier assertion that "it
is clear from the Affidavit that the tree partially obstructed
the view of the pole camera across the street, thus actually
minimizing any potential intrusion."  Compare Mot. Recons. Mem.
& Order & Continue Trial Date Allow Recons. ("Mot. Recons.") 6
with Government's Opp'n Defs.' Mot Suppress Pole Camera Evid. 5,
ECF No. 367.

ADDENDUM                                                   013

Further, the Government neglects to explain to the Court why the Court ought excuse the Government's waiver of its argument that the good faith exception to the exclusionary rule applies. <u>Compare</u> Am. Mem. & Order 4-5 n.2, ECF No. 422 <u>with</u> Mot. Recons. 7-8. The Court concludes that the Government's remaining arguments lack merit.

Accordingly, the Court DENIES the Court DENIES the Government's motion, ECF No. 423. There shall be no continuance.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE

[2]